UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JEROME CURRY,                                          :

                Petitioner,                    :

           -against-                         :

JOHN BURGE, Superintendent,                   :
Auburn Correctional Facility,
                                                       :
             Respondent.
                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       03 Civ. 0901 (LAK) (AJP)

  **REPORT AND RECOMMENDATION**

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Lewis A. Kaplan, United States District Judge:**

          On February 7, 2003, petitioner Jerome Curry sought a writ of habeas corpus from his March 17, 1998 and August 11, 1998 convictions of, inter alia, second degree murder, second degree attempted murder, first and second degree assault, and weapons possession, and consecutive sentences of 35 years and 25 years to life imprisonment.  (Dkt. No. 2: Pet. ¶ 1.)  See People v. Curry 287 A.D.2d 252, 252, 731 N.Y.S.2d 1, 2 (1st Dep't), appeal denied, 97 N.Y.2d 680, 738 N.Y.S.2d 295 (2001).  Curry's habeas petition raised six grounds, one of which was that he he was denied the effective assistance of trial counsel (Pet. ¶¶ 6(a), 7-40.)

          On November 17, 2004, this Court recommended that Curry's habeas petition should be denied in its entirety, and on January 19, 2005, Judge Kaplan adopted my Report and Recommendation.  Curry v. Burge, 03 Civ. 0901, 2004 WL 2601681 (S.D.N.Y. Nov. 17, 2004)

2

(Peck, M.J.), report & rec. adopted, 2005 WL 106490 (S.D.N.Y. Jan. 19, 2005) (Kaplan, D.J.).

Familiarity with these decisions is assumed.

By mandate dated March 7, 2007, the Second Circuit affirmed denial of Curry's

habeas claims except parts of his ineffective assistance claim.   (Dkt. No. 41: 3/7/07 2d Cir.

Mandate.)   The Second Circuit remanded the case "with instructions to:  (1) determine whether

[Curry's] trial counsel investigated the allegedly exculpatory witnesses [as to Curry's July 1998

murder trial] and, if not, whether that failure constituted deficient performance; (2) whether, in light

of the record of the July 1998 trial, counsel's failure to call the exculpatory witnesses affected the

outcome of that trial; and (3) whether counsel's summation at the July 1998 trial constituted deficient

performance and, if so, whether that deficiency prejudiced [Curry]."  (3/7/07 2d Cir. Mandate.)

On remand, this Court appointed counsel for Curry pursuant to the Criminal Justice

Act (Dkt. Nos. 49, 51), and on August 9, 2007 held a hearing to address the ineffective assistance

issues, at which Curry and his trial counsel Duboulay testified.  (Dkt. No. 51: 5/25/07 Order; Dkt.

No. 57: 8/9/07 Hearing Transcript ["H."] 1-47.)

For the reasons set forth below, Curry's remaining ineffective assistance habeas

claims again should be DENIED.

## FACTS

The facts surrounding Curry's multiple charges, two trials, and original habeas claims are set out in this Court's prior Report and Recommendation and Judge Kaplan's Opinion and Order, familiarity with which are assumed. Curry v. Burge, 03 Civ. 0901, 2004 WL 2601681 (S.D.N.Y. Nov. 17, 2004) (Peck, M.J.), report & rec. adopted, 2005 WL 106490 (S.D.N.Y. Jan. 19, 2005) (Kaplan, D.J.).

## Background

"The police caught petitioner Jerome Curry and took him to the 33rd Precinct in connection with the September 20, 1996 drive-by shooting of Joseph Long, who was sitting on a stoop with others when a person in a passing car riddled the stoop with bullets. Once Curry and another suspect, Pedro Guzman, were at the station house, Guzman implicated Curry in another shooting that had taken place on July 15, 1996 in which Reginald Frazier was hit; Frazier was among those sitting on the stoop with Long on September 20. Guzman also implicated Curry in an August 30, 1996 drug-related homicide." Curry v. Burge, 2004 WL 2601681 at *1. The remanded ineffective assistance habeas claims relate to Curry's July 1998 trial for the August 30, 1996 homicide.

On September 22, 1996, "Curry signed the statements written out by Detective Primus about the crimes." Curry v. Burge, 2004 WL 2601681 at *4. Later that morning, "A.D.A. McCabe took a videotaped statement from Curry in Detective Primus' presence." Curry v. Burge, 2004 WL 2601681 at *4. "In the statements, Curry admitted his participation in the events of . . . August 30th," 1996. Curry v. Burge, 2004 WL 2601681 at *4.

"On October 7, 1997, Justice Carol Berkman issued a twenty-two page decision addressing the issues raised at the suppression hearing by Curry, [and his then co-defendants] Guzman and Henriquez." Curry v. Burge, 2004 WL 2601681 at *4. (See also Dkt. No. 18: Answer, Appendix Ex. A: 10/7/97 Suppression Order.) "Justice Berkman denied Curry's motions to suppress, holding," inter alia, that "the evidence was sufficient to establish that Curry's written, signed, and videotaped statements were the product of his own volition and thus admissible" at trial. Curry v. Burge, 2004 WL 2601681 at *4. (See also 10/7/97 Suppression Order at 13-14.)

In July 1998, Curry was convicted of second degree murder, first and second degree robbery, and weapons possession, and sentenced on August 11, 1998 to concurrent sentences, the longest of which was twenty-five years to life, to run "consecutively to the [35 year] sentences imposed on the March 17, 1998" convictions for the July 15, 1996 and September 20, 1996 crimes. Curry v. Burge, 2004 WL 2601681 at *7. (Pet. ¶ 1.) See also People v. Curry, 287 A.D.2d 252, 252, 731 N.Y.S.2d 1, 2 (1st Dep't), appeal denied, 97 N.Y.2d 680, 738 N.Y.S.2d 295 (2001).

**Statements by Three Witnesses to the August 30, 1996 Homicide**

The police prepared "DD-5" interview reports about three witnesses to the August 30, 1996 homicide: Ralph Rordan, Michelle Miller and Nekeisha Heron. (Dkt. No. 47: 5/16/07 Gov't Supp. Opp. Br. Exs. A, C, D.) Two of those witnesses identified Curry at lineups as involved in the August 30, 1996 shooting. (5/16/07 Gov't Supp. Opp. Br. Ex. B.) Michelle Miller described a man in the back seat of the car as a "male black, 20's, 5'11"-6'1", dark skin, eye glasses, plain black BB cap." (Gov't Supp. Opp. Br. Ex. C: Miller Interview Report.) Miller said that that man got out of

the car, she heard a shot, and the "man with the eyeglasses ran towards Broadway." (Id.)  During a

later lineup, Miller identified Curry as the man she "saw running" on 145th Street.  (5/16/07 Gov't

Supp. Opp. Br. Ex. B: Lineup Report)  Nekeisha Heron told police that she "saw the man who was

shot chasing a male who looked taller [than] him, brown skin, young. . . . The thinner male . . . got

into a dark blue four door car with tinted windows.  He got into the back seat on the passenger side.

The man who was shot ran up to the car.  [She] heard something that sounded like a car back firing."

(5/16/07 Gov't Supp. Opp. Br. Ex. D: Heron Interview Report.)  At a later lineup, Heron identified

Curry as "the one who was talking to the fat man."  (5/16/07 Gov't Supp. Opp. Br. Ex. B: Lineup

Report)  Ralph Rordan told police that "there [were] about three guys in the car," but he only saw

the driver, and he "saw shots fired from the Lexus."  (5/16/07 Gov't Supp. Opp. Br. Ex. A: Rordan

Interview Report.)  Rordan also told police that the victim lived across the street from him and "that

he heard that the victim was a nice guy."  (Id.)

**Curry's Direct Appeal**

                Curry's counsel submitted a brief and Curry submitted a pro se supplemental brief to

the First Department appealing his convictions.  (Dkt. No. 18: Answer, Ex. B: Curry 1st Dep't Br.;

Ex. C: Curry Supp. Pro Se 1st Dep't Br.)  Curry raised six claims, see Curry v. Burge, 2004 WL

2601681 at *7, including ineffective assistance of trial counsel (Curry 1st Dep't Supp. Br. at 6-30).

Specifically, Curry alleged, inter alia, that trial counsel Donald Duboulay failed to investigate and

call at his murder trial "several eye-witnesses to the murder-crime, who gave exculpatory statements

and accounts of how the murder actually occured, accounts that were in total conflict with

Mr. Guzman's trial testimony of how and who shot the deceased, accounts that – at the same time – exculpat[]ed [Curry] of murder."  (Curry Supp. Pro Se 1st Dep't Br. at 19; see id. at 20-21.)[1/]  Curry also alleged that Duboulay's summation was ineffective for (i) suggesting that Curry threw away the murder weapon, (ii) arguing that the prosecutor did not call the eyewitnesses, "misleading the jury away from the fact that [defense] counsel could have produced this live eyewitness testimony at trial," and (iii) arguing that Curry "confessed truthfully after being caught 'off balance' with 'bold face tricks.'"  (Id. at 21-24, citations omitted.)[2/]

On October 2, 2001, the First Department affirmed Curry's convictions, holding, inter alia, that:  "Based on the totality of the existing record, we conclude that defendant received meaningful representation at all of the proceedings at issue." People v. Curry, 287 A.D.2d 252, 253-54, 731 N.Y.S.2d 1, 3 (1st Dep't) (citation omitted),[3/] appeal denied, 97 N.Y.2d 680, 738 N.Y.S.2d 295 (2001).

---

[1/]     Curry noted that Duboulay "attempted to bring out [these facts] on cross-examination of Detective DeLeon, . . . The prosecutor however rightly objected to this line of questioning by counsel as being hearsay."  (Id. at 19.)

[2/]     Neither Curry's counsel nor Curry argued to the First Department that counsel was ineffective for failing to call a false confession expert or for not referring to a false confession expert in summation.  (See generally Curry 1st Dep't Br. & Curry Supp. Pro Se 1st Dep't Br.)  See Point II. C. below.

[3/]     The First Department's decision is quoted in full in my prior decision.  Curry v. Burge, 2004 WL 2601681 at *7-8.

**Curry's Habeas Corpus Petition and Court Decisions Thereon**

Curry's pro se federal habeas corpus petition (Dkt. No. 2) raised six grounds, including, inter alia, that he was denied the effective assistance of trial counsel (Pet. ¶¶ 6(a), 7-40).[4] On November 17, 2004, this Court recommended that Curry's habeas petition should be denied in its entirety, and on January 19, 2005, Judge Kaplan adopted my report and recommendation. Curry v. Burge, 03 Civ. 0901, 2004 WL 2601681 (S.D.N.Y. Nov. 17, 2004) (Peck, M.J.), report & rec. adopted, 2005 WL 106490 (S.D.N.Y. Jan. 19, 2005) (Kaplan, D.J.).

By mandate dated March 7, 2007, the Second Circuit denied a Certificate of Appealability for all of Curry's claims except for his ineffective assistance claim as to "counsel's summation and failure to call exculpatory witnesses," thus affirming the denial of all other claims. (Dkt. No. 41: 3/7/07 2d Cir. Mandate.)  The Second Circuit granted a Certificate of Appealability as to the ineffective assistance claim and remanded "with instructions to:  (1) determine whether [Curry's] trial counsel investigated the allegedly exculpatory witnesses [as to Curry's July 1998 murder trial] and, if not, whether that failure constituted deficient performance; (2) whether, in light of the record of the July 1998 trial, counsel's failure to call the exculpatory witnesses affected the

---

[4]     This Court's prior opinion summarized Curry's ineffective assistance claims, as follows:

> Curry alleges that his trial counsel was ineffective for:  (a) failing to call three witnesses that Curry claims could have exculpated him; (b) failing to inform Curry that he could testify on his own behalf; (c) failing to move for discovery; (d) abandonment of the Rosario and Batson issues; and (e) a defective summation. (Dkt. No. 2: Pet. ¶¶ 6(a), 7-40; Dkt. No. 3: Curry Br. at 1, 8-28.)

Curry v. Burge, 2004 WL 2601681 at *27.

outcome of that trial; and (3) whether counsel's summation at the July 1998 trial constituted deficient performance and, if so, whether that deficiency prejudiced [Curry]."  (3/7/07 2d Cir. Mandate.)

**Proceedings on Remand**

**Trial Counsel's Affidavit**

On remand, the Court directed the parties to address the Second Circuit's three questions.  (Dkt. No. 42: 3/16/07 Order.)  Curry filed pro se letters on March  26, 2007, May 16, 2007 and May 28, 2007, reiterating his ineffective assistance of counsel claims.  (Dkt. Nos. 44, 48 & 52: 3/26/07, 5/16/07 & 5/28/07 Curry Ltrs.)  On May 16, 2007, A.D.A. Beder filed an opposition brief and attached an affidavit from Curry's July 1998 trial counsel, Donald Duboulay.  (Dkt. No. 47: 5/16/07 Gov't Supp. Opp. Br. & Ex. G: Duboulay Aff.)  Duboulay's May 10, 2007 affidavit explained the strategic reasons that he did not call the three eyewitnesses to testify at Curry's July 1998 trial, as follows:

> 2.   Before trial, I received police paperwork from the trial prosecutor, Assistant District Attorney Steve Nuzzi, in connection with this case.  Included in that paperwork were the DD5s to which Mr. Curry refers in his petition for a writ of habeas corpus, as well as other police paperwork detailing the progress of the investigation.
>
> 3.   Based on my review of that paperwork, I learned that three people, Michelle Miller, Nakeisha Heron and Ralph Rordan, had made statements to the police concerning their observations at the time Reginald Myers was shot.  I further learned other information about these three people that demonstrated that calling them as witnesses would not have helped Mr. Curry's case.
>
> 4.   Specifically, <u>from my review of the police paperwork, I learned that both Michelle Miller and Nakeisha Heron had identified Mr. Curry in a lineup.  It was my belief that their testimony would thus damage Mr. Curry's case far more than it would have advanced it.</u>

H:\OPIN\CURRY2

5.  I also believed that <u>Ralph Rordan's testimony</u> would not have helped Mr. Curry, as it <u>would [have] corroborated much of Guzman's account of the murder,</u> including  that there were three men in the car, that the shot was fired from inside the car, as well as the make of car from which the shot was fired.  As it was, the only evidence placing Mr. Curry at the scene of the murder came from Curry's own statement and the cooperating co-defendant's testimony, and my strategy was based on attacking those two pieces of evidence.  It was my position that introducing independent witnesses who would have corroborated much of Guzman's and Curry's statements – both of which I argued were unreliable – would only have undermined Mr. Curry's case.

6.  Further, Rordan knew Myers, and had heard that he was a "nice guy."  I was concerned that testimony along these lines would serve to engender sympathy for the victim from the jury.

7.  Having reached the conclusion, based upon my professional judgment, that neither Miller, Heron, nor Rordan should be called as a witness on Mr. Curry's behalf, I discussed the matter with Mr. Curry.  I do not remember the specific details of the conversation, but it certainly would have been my practice to explain to him why I believed these three people could only hurt his chances of an acquittal.

8.  <u>My theory of defense in this case was simple:  only two pieces of evidence</u> <u>connected my client to the crime.  First, there was Guzman's account, and I took the</u> <u>position that Guzman was unreliable because of his deal with the prosecution.</u> <u>Second was Mr. Curry's own statement, which I argued was involuntary because it</u> <u>had been coerced by the police.</u>  I recently reread my summation from Mr. Curry's murder trial, and based on that review I believe that my arguments were consistent with this defense.  After attacking the People's evidence, I asked the jury to disregard both Guzman's testimony and Mr. Curry's statement, and to acquit Curry based on the People's failure to prove their case beyond a reasonable doubt.

. . . .

10.  Mr. Curry also notes that I argued that there were other witnesses, but that the prosecution had failed to call these people to testify.  Based on my review, it appears that I made the strategic choice to attempt to create reasonable doubt in the jurors' minds by suggesting that the prosecution had withheld information, in light of my belief that Miller, Heron, and Rordan would only have damaged Mr. Curry's case in the end.  Also, <u>had I called Miller, Heron or Rordan as a part of Mr. Curry's</u> <u>case, I would have seriously undermined my defense theory, as two of three would</u>

<u>have placed Mr. Curry at the scene of the crime, and all three would have
corroborated many of the details of Guzman's account of the shooting</u>.

(5/16/07 Gov't Supp. Opp. Br. Ex. G: Duboulay Aff. ¶¶ 2-8, 10, emphasis added.)   Duboulay's

affidavit also further responded to Curry's complaints about his summation.   (Duboulay Aff. ¶¶ 9,

11.)

### Hearing

This Court appointed counsel – Edward Wilford – under the Criminal Justice Act to

represent Curry (Dkt. Nos. 49, 51), and on August 9, 2007 held a hearing to address the ineffective

assistance issues.  (Dkt. No. 57: H. 1-47; <u>see also</u> Dkt. No. 51: 5/25/07 Order.)  At the hearing, Curry

testified via video conference from prison (H. 6-13), and Curry's trial counsel Donald Duboulay

testified (H. 14-35).   With one exception – whether Curry insisted that Duboulay call the three

witnesses – their testimony was consistent.

### Curry's Testimony About The Three Witnesses[5/]

Regarding investigation of the allegedly exculpatory witnesses, under direct

examination by attorney Wilford, Curry testified as follows:

> Q.  Mr. Curry, when did . . . Mr. Duboulay inform you that there were witnesses who
> gave statements to the police?
>
> A.  He informed me in the beginning of the trial stages, after he provided me with a
> copy of the statements.
>
> Q.   And <u>did you discuss with Mr. Duboulay the contents of the statements of the
> witnesses</u>?

---

[5/]   Curry's only testimony about summation was that Duboulay never discussed his strategy for
summation with him.  (Curry: H. 10-11.)

A.  <u>Yes, I did</u>.

. . . .

Q.  Did you discuss with Mr. Duboulay that some of the witnesses had identified you in a lineup?

A.  We discussed that a little after he provided me with the statements.  That was only a few days before trial, which at that point I asked him to call them in.

. . . .

Q.  What, if anything, did Mr. Duboulay ever tell you about his request for the names and addresses of the witnesses from the prosecutors?

A.  Well, he told me that he had discovered that there were several witnesses that claimed to have witnessed the crime.  I asked him to call them in, and he told me that he would look into it.  Well, we never really sat down and discussed the issue.

Q.  What, if anything, did Mr. Duboulay tell you about retaining an investigator to take witnesses' statements?

A.  Well, he never told me he retained one, but I did see one at one point, and after we ended the interview, [the investigator] told me that there was nothing really that he could do for me, there was not much he could have done.

. . . .

Q.  Now did you ever specifically – or did there ever come a time when you specifically asked Mr. Duboulay to have – or to attempt to interview the witnesses?

A.  Several times.  I remember that he interviewed them a couple of times right before trial and I asked him – and we were in trial.  Before the trial was over, I also asked him to call them in.

Q.  And what, if anything, did you discuss with Mr. Duboulay in terms of using the statements of the witnesses in the police reports?

A.  Well, I explained to him the discrepancies between their statements and my statement and the statements of my codefendants and the description given by the

witnesses of the make of the car and the people they witnessed commit the crime and the fact that there were other people with the victim.

. . . .

Q. . . . What, if anything, had you discussed with Mr. Duboulay in terms of why he was not calling the witnesses?

A. Well, the only explanation he gave me was that I have been identified in a lineup by one or two of these witnesses and I explained to him that probably this could have been – these witnesses could have been either coached or coerced to pick me out of a lineup, being that they gave a description that was totally at odds with my description.

Q. So what, if anything, did you observe about the descriptions that were given in the police reports by the witnesses?

A. Well, I remember that one of the witnesses described that the victim was in the company of a young lady and two other males, one of them being about – supposed to be, I think – the one that supposedly shot the victim was about 6 feet to 6 feet 1, that they were talking – as opposed to being inside the car, they were standing and talking with the victim, walking down the street, that they called him by name, the fact that one of them described the car, the make of the car, totally different from the car that my codefendant owned, and stuff of that nature.

Q. How tall you are you, Mr. Curry?

A. 5,8.

Q. And at the time of the incident how much did you weigh?

A. Approximately about 140.

. . . .

Q. Did you at any time discuss with Mr. Duboulay the discrepancies and descriptions in the police reports?

A. Well, almost at the end of the trial I remember that he attempted to read statements of the witnesses to the jury while he was cross-examining Detective

DeLeon, and I asked him, you know, why, instead of attempting to read the statements, didn't you just call the witnesses personally to give testimony, which you know, could have made a difference.

Q.  Did you ever have a discussion with Mr. Duboulay prior to trial about the discrepancies in the descriptions - -

. . . .

A. [During the pretrial hearings,] after he provided me with the statements of the witnesses and I went over them, you know, I noticed the discrepancies in the descriptions and <u>I asked him, you know, several times to call, you know, call all three of them in to testify, and the only explanation he gave me was that he wasn't gonna call them because they had identified me in the lineup.</u>

(Curry: H. 6-12, emphasis added.)[6/]

---

[6/]  A.D.A. Beder, cross-examined Curry about his failure to mention anywhere in his detailed habeas petition that, as he now testified, he had requested trial counsel Duboulay to call the three witnesses to testify:

> Q.  You were testifying that you asked Mr. Duboulay to call these witnesses several times, is that right?
>
> A.  Yes.
>
> Q.  When did you remember that you had that conversation with Mr. Duboulay?
>
> A.  Well, we spoke about that during the pretrial hearings and during the course of the trial.
>
> Q.  And had you forgotten about that and then remembered it again during the course of these proceedings?
>
> A.  Well, I never forgot it but, you know, I was under the impression that he was gonna call them, or I wanted him to call them.
>
> Q.  But you didn't include that in your petition that you wrote in 2002 and 2003, correct?

(continued...)

### Attorney Duboulay's Testimony About The Three Witnesses

Curry's July 1998 trial counsel Donald Duboulay testified on direct examination by

A.D.A. Beder, consistently with his affidavit, as follows:

> A.  I was assigned [Curry's] case I believe in September of 1996.  I am on the homicide panel.  Did normal things I usually do; <u>hired investigators, reviewed discovery, had numerous conversations with Mr. Curry,</u> I explained the process to him, tried to negotiate a resolution of the matter.  None could be had in this matter.  I prepared for trial, <u>discussed the defense strategy with him,</u> discussed the witnesses as I found them to be.

> Q.  Do you recall what your trial strategy was?

> A.  Yes.  I believe, although I'm not – I'm not certain, but I believe I received the – what we would call <u>Rosario</u> material, which is statements of witnesses, just prior to the hearings, which is just prior to the trial, with the witnesses' names and with their addresses blocked out.  Discussed that with Mr. Curry, the pros and cons of calling them, of course.  Mr. Curry had made a statement, which I believe we had a suppression hearing on.  There were – we were informed that there was a codefendant who was a cooperator.  <u>Mr. Curry's statement and the cooperator's meshed in many regards, as well as some of the witnesses' statements.  And our strategy was police frame-up, that his statements were involuntary and that Mr. Guzman could not be believed,</u> that he, in return for the deal that he had, he inculpated Mr. Curry, that he was unbelievable.

> Q.  Did you have an opportunity to review the police paperwork in connection with this case?

> A.  Yes, some of it, yes.

---

6/      (...continued)
         A.  Possibly not.  I don't remember.

(Curry: H. 13.)  The Court has re-reviewed Curry's pro se brief to the First Department and his detailed pro se federal habeas petition – and nowhere did he allege that he had asked counsel to call the three witnesses to testify at trial.

Q.  And from that review did you learn about the three witnesses that are at issue here?

A.  Yes.

Q.  Did you consider calling them as witnesses as the trial?

A.  I did not.  We discussed this.  The three witnesses, almost all of them gave almost identical versions of Mr. Curry's statements to the police, as well as the cooperator's statements to the police.  I felt they would corroborate his confession and obviate a defense that we had.  Not only that, but I think within two weeks of the shooting, two of the witnesses picked him out of a lineup.  There were minor things that they – one of them said the shooter was 2 inches taller.  But I think all three people said the shots emanated from a car, they put three people in the car . . . Just too many corroborating details that those witnesses gave.  Along with the lineup identification, it just didn't make sense to call these people as witnesses, especially in a direct case. It would devastate us.

Q.  Did you discuss that, your view, with the petitioner [Curry]?

A.  Absolutely.

Q.  Did you explain your point of view to him?

A.  Yes.

Q.  Notwithstanding your decision not to call these witnesses at trial, did you ask Detective DeLeon about them at one point?

A.  I did during the trial.  I tried to elicit the good parts of what those people said without having to bring up all the negative aspects of what those people had to say, that is, the chase of the – the victim chasing one of the suspects back to the car, the shot being fired from inside the car.  I tried to get out the fact that there were other witnesses that weren't called by the people.

Q.  And so what did the jury hear then?

A.  The jury didn't hear the bad part, they heard some of the good part, that in fact there were people there who the prosecutor did not call.

Q.  And was that consistent with your – [trial strategy?]

A.  It was.

(Duboulay: H. 15-18, emphasis added.)

During cross examination by Curry's habeas counsel, Duboulay testified as follows:

Q.  Mr. Duboulay, when you were on trial, or prior to trial with Mr. Curry, do you recall when you received the police reports concerning the statements of the witnesses?

A.  I don't have a specific recollection, but I know it's the practice of the prosecutor's office, at least at that time in state practice, to turn over the statements just prior to trial.  Probably when the hearings began, maybe a couple of days before the trial.

. . . .

Q.  Now did you discuss the contents of those witnesses' statements with Mr. Curry?

A.  I did.  I gave him copies of everything I had and I discussed it with him.

Q.  Did you at any point attempt to ascertain the name with the addresses or means of contacting these three witnesses?

A.  I'm pretty sure I did.  I don't have any specific recollection, but I know as a general rule I would try to ask the prosecution, if you're going to call the witnesses, give me the address.  I think the [prosecution's] practice is not to give us the address. Judges routinely refused to order the prosecutors to give us the address of the witnesses.

Q.  You said you did have an investigator in this case.

A.  I believe so.  I generally would do so in a murder case, but I don't recall.

. . . .

Q.  Did you specifically direct the investigator to interview the witnesses?

A.  Probably not.  I don't think I had their addresses.  Probably not.  I'm not sure exactly what I told him.  It's a homicide case.  I may have told him to scour the neighborhood, see what you can find out, talk to shop owners, whatever.

Q.  Well, with respect to these particular witnesses did you give him any instructions to try to locate these witnesses –

A.  I don't recall doing so.  I don't recall doing so.

. . . .

Q.  Mr. Duboulay, I'm handing you . . . five DD-5s [marked as Hearing Exhibit 1]. . . .

. . . .

Q.  Mr. Duboulay, the description of the perpetrator that was provided by Ms. Miller, that wasn't the description that fits my client, was it?

A.  She described the person talking to him I believe as 5,11, 6,1, and she described – she didn't describe what the shooter looked like, though.  I don't believe she said – she didn't hear – she heard a shot.  She described the person that was talking to him was about I think 5, 11.

Q.  And how tall is Mr. Curry?

A.  He tells me he's 5,8.

Q.  And did he wear eyeglasses?

A.  I – no, I don't think so.

Q.  And what about Ms. Heron?

A.  She said the person was thin, I believe, that was being chased by the victim.

Q.  Okay.  And was the description of the events by Ms. Heron and Ms. Miller consistent with one another?

A.  I guess in some respects it would be, some respects it wouldn't.

Q.  And did Mr. Rordan give a description of the individual?

A.  He described I believe the driver of the car.

Q.  And he didn't give any description as to the shooter, right?

A.  I don't believe so.

Q.  Now the three – of those three witnesses, which one of them gave a description of the shooter?

A.  Maybe none of them did.

Q.  And they all, however, picked Mr. Curry out of a lineup as the shooter.

A.  Well, they picked him out as being at the scene of the shooting.

Q.  But not as being the shooter.

A.  Ms. Miller said, as the gentleman who was 5 feet 11 was talking to the shooter, a shot rang out.  . . . . I'm not sure if anybody said who the shooter was.  I can't remember.

Q.  And none of them gave the description that actually fit Mr. Curry, isn't that correct?

A.  That could be argued, yeah.

Q.  And notwithstanding that, did you make a written request to the district attorney's office to be provided with the addresses and location information of these witnesses?

A.  Not a written request, no, sir.

Q.  Did you ask the Court to intercede to direct the district attorney's office to provide you with information so that you could be able to at least talk to these witnesses?

A.  I don't believe so.

Q.  And it's a fact that your investigator never spoke to these witnesses, is that correct?

A.  No, he did not.

Q.  And you never spoke to these witnesses.

A.  I did not.

Q.  So you never had an opportunity to contrast and compare the witnesses' statements with the police, not describing your client as even being at the scene and yet the ability to pick him out of a lineup?

A.  Well, . . . I compared the statements and the facts they gave to each other.  I discussed that with my client.

. . . .

Q.  And do you remember Mr. Curry asking you to produce these witnesses at trial?

A.  He never did.

Q.  And do you remember Mr. Curry asking you to speak with the witnesses?

A.  Mr. Curry and I had lengthy discussions about the pros and cons of calling these witnesses, and the cons far outweighed the pros.

Q.  And –

A.  That was discussed prior to trial.

Q.  And when were those discussions?

A.  Probably during the hearings, probably after I received the discovery.  I made him copies.  I gave him copies of everything I had.  We discussed the theory of this case, theory of defense, we discussed who the witnesses were going to be.

(Duboulay: H. 21-27, emphasis added.)[7]

### Curry's Habeas Counsel's Argument That The Summation Was Deficient For Failure To Argue Aboout A False Confession Expert

At the close of the hearing, Curry's habeas counsel Wilford alleged an additional,

novel deficiency in the summation, for failure to argue about a false confession expert, as follows:[8]

MR. WILFORD:  . . . My position is as follows:  The failure to introduce false confession evidence in conjunction with the failure to properly investigate put

---

[7]  Duboulay also testified extensively about the strategy behind his summation and responded to Curry's complaints about the summation.  (Duboulay: H. 18-20, 29-33.)  Because Curry withdrew his original ineffective assistance summation claim after the hearing (see Point II. B. below), the Court will not summarize Duboulay's testimony.

[8]  On cross-examining Duboulay, the following questioning and colloquoy occurred:

Q.  Did you, sir, during the course of your representation pursue retaining a false confession expert?

A.  No.

[A.D.A.] Beder:  Objection.

THE COURT:  Sustained.  Outside the scope of this hearing.

MR. WILFORD:  Well, your Honor, if I may be heard.

THE COURT:  Let's finish with the witness.  I mean, he answered anyway so it's there for the circuit.  But it does strike me that if there were additional defects being claimed by you now that you're representing Mr. Curry, the proper procedure is to go back to state court on a supplemental or second or third, whatever it's up to, 440, that if it were not presented to state court, it's not something at this late stage of this case on remand on a specific issue that the Court will take into consideration, or can take into consideration.

(H. 33-34.)

Mr. Curry at a disadvantage and there was deficiency in the summation to argue in this –

. . . .

I'll submit to the Court that the failure to do so was a deficiency in the summation in terms of debilitating the effect of arguing to the jury that the statement provided by Mr. Curry was indeed false.  Simply stating that the statement was false did not do true justice to the ability of the jury to fully understand the nature and circumstances which leads to false confessions and –

THE COURT:  Are you suggesting that in every false confession case or case where it's argued that the confession is false it is incumbent upon [defense] counsel to present a false confession witness, false confession expert?

MR. WILFORD:  I think that's the better practice, yes.

THE COURT:  There's a difference between better practice and does that violate Strickland by constituting ineffective assistance.  And before you answer that question, you might want to think and look into your record in cases in front of this Court or other courts and tell me or tell yourself before you answer the question in every case where a defense lawyer is arguing that the confession was in any way coerced in whole or in part that counsel is ineffective under the first prong of Strickland if they don't proffer to the Court a false confession expert.

MR. WILFORD:  Well, your Honor, I don't think that Strickland is the bright-line in terms of saying you have to do this in a particular case, and in each case I would be remiss to say that, but when you look at the particular facts of the case and relate it to the standards of Strickland –

THE COURT:  How is this case different than any other case in which the primary prosecution evidence is a false confession, allegedly false confession?

MR. WILFORD:  Well, as I stated, your Honor, the failure to call an expert witness in this situation when all – when that was the primary thrust of the summation and the argument proffered by Mr. Duboulay on behalf of Mr. Curry –

THE COURT:  Any case so holding?

MR. WILFORD:  Judge, I don't know off the top of my head.

THE COURT:  I'll ask you to get me a brief on this limited subject if you want to pursue this subject.

MR. WILFORD:  Fine.  And what I would request, your Honor, rather than making any final argument now, is to submit papers to the Court based on the [hearing] transcript.

(H. 36-39.)  Curry's habeas counsel conceded that this issue was never raised in state court nor in Curry's federal habeas petition.  (H. 36.)[9]

The Court also directed counsel to discuss with Curry whether in light of the hearing testimony he wished to withdraw any of his remaining habeas claims.  (H. 39-40, 45-46.)

———————————

[9]        THE COURT:  Was this argument [about summation and the false confession expert] raised at any point prior to today in the state court or this court?  If the answer is no, then the issue is barred.

MR. WILFORD:  Well, just so I can make the record.

THE COURT:  Just answer my question.  Was it raised –

MR. WILFORD:  No.

THE COURT:   – in state court?

MR. WILFORD:  No.

THE COURT:  Was it raised in this court in any of Mr. Curry's petitions?

MR. WILFORD:  No.

THE COURT:  Okay.  Make your argument, but I'm dubious, to put it mildly.

(H. 36.)

**ANALYSIS**[10/]

**I.    THE STRICKLAND V. WASHINGTON STANDARD ON INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL [11/]**

In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective:  "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by

---

[10/]    The Court discussed the AEDPA review standard in its original decision, Curry v. Burge, 2004 WL 2601681 at *8-10, and will not repeat it herein.  See also, e.g., Rivera v. Ercole, 07 Civ. 3577, 2007 WL 2706274 at *7-10 (S.D.N.Y. Sept. 18, 2007) (Peck, M.J.) (& cases cited therein).

[11/]    For additional decisions authored by this Judge discussing the Strickland v. Washington standard for ineffective assistance of counsel in language substantially similar to this section of this Report and Recommendation, see, e.g., Rivera v. Ercole, 07 Civ. 3577, 2007 WL 2706274 at *15-16 (S.D.N.Y. Sept. 18, 2007) (Peck, M.J.); Rivera v. United States, 06 Civ. 14421, 04 Crim. 407, 2007 WL 1953430 at *6-7 (S.D.N.Y. July 6, 2007) (Peck, MJ); Brown v. Greene, 06 Civ. 4824, 2007 WL 1379873 at *11-12 (S.D.N.Y. May 11, 2007) (Peck, M.J.); Cassie v. Graham, 06 Civ. 5536, 2007 WL 506754 at *21-23 (S.D.N.Y. Jan. 31, 2007) (Peck, M.J.); Brown v. Brown, 05 Civ. 10434, 2006 WL 3405480 at *14-15 (S.D.N.Y. Nov. 27, 2006) (Peck, M.J.) (citing my prior decisions); Pena v. United States, 04 Civ. 9700, 00 Cr. 36, 2005 WL 1176073 at *4-5 (S.D.N.Y. May 18, 2005) (Peck, M.J.); Yapor v. Mazzuca, 04 Civ. 7966, 2005 WL 894918 at *23-25 (S.D.N.Y. Apr. 19, 2005) (Peck, M.J.) (citing my prior decisions), report & rec. adopted, 2005 WL 1845089 (S.D.N.Y. Aug. 3, 2005); Curry v. Burge, 03 Civ. 0901, 2004 WL 2601681 at *26-27 (S.D.N.Y. Nov. 17, 2004) (Peck, M.J.) (citing my prior decisions); Montalvo v. Annetts, 02 Civ. 1056, 2003 WL 22962504 at *22-24 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.) (citing my prior decisions); Quinones v. Miller, 01 Civ. 10752, 2003 WL 21276429 at *18-19 (S.D.N.Y. June 3, 2003) (Peck, M.J.) (citing my prior decisions), report & rec. adopted, 2005 WL 730171 (S.D.N.Y. Mar. 31, 2005), aff'd, 224 Fed. Appx. 44 (2d Cir. 2007); Larrea v. Bennett, 01 Civ. 5813, 2002 WL 1173564 at *16-19 (S.D.N.Y. May 31, 2000) (Peck, M.J.), report & rec. adopted, 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002), aff'd, 368 F.3d 179 (2d Cir. 2004); Fluellen v. Walker, 97 Civ. 3189, 2000 WL 684275 at *11 (S.D.N.Y. May 25, 2000) (Peck, M.J.), aff'd, 41 Fed. Appx. 497 (2d Cir. 2002), cert. denied, 538 U.S. 978, 123 S. Ct. 1787 (2003).

the Sixth Amendment."  Id. at 687, 104 S. Ct. at 2064.[12]  This performance is to be judged by an

objective standard of reasonableness.  Strickland v. Washington, 466 U.S. at 688, 104 S. Ct. at

2064.[13]

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction . . . .
> A fair assessment of attorney performance requires that every effort be made to
> eliminate the distorting effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct from counsel's perspective
> at the time . . . .  [A] court must indulge a strong presumption that counsel's conduct
> falls within the wide range of reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the circumstances, the
> challenged action "might be considered sound trial strategy."

Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).[14]

Second, the defendant must show prejudice from counsel's performance.  Strickland

v. Washington, 466 U.S. at 687, 104 S. Ct. at 2064.  The "question is whether there is a reasonable

probability that, absent the errors, the fact finder would have had a reasonable doubt respecting

guilt." Id. at 695, 104 S. Ct. at 2068-69.  Put another way, the "defendant must show that there is

---

[12] Accord, e.g., Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); Bell v. Miller, – F.3d –, 2007 WL 2469423 at *4 (2d Cir. Aug. 31, 2007); Henry v. Poole, 409 F.3d 48, 62-63 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006).

[13] Accord, e.g., Wiggins v. Smith, 539 U.S. at 521, 123 S. Ct. at 2535; Bell v. Cone, 535 U.S. 685, 695, 122 S. Ct. 1843, 1850 (2002); Henry v. Poole, 409 F.3d at 63.

[14] Accord, e.g., Bell v. Cone, 535 U.S. at 698, 122 S. Ct. at 1852; Bell v. Miller, 2007 WL 2469423 at *6; Henry v. Poole, 409 F.3d at 63; Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id</u>. at 694, 104 S. Ct. at 2068.[15/]

The Supreme Court has counseled that these principles "do not establish mechanical rules." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 696, 104 S. Ct. at 2069.  The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process.  <u>Id</u>.

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001) (quoting <u>Strickland</u> v. <u>Washington</u>, 466

---

[15/]    See also, e.g., <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 534, 123 S. Ct. at 2542; <u>Bell</u> v. <u>Cone</u>, 535 U.S. at 695, 122 S. Ct. at 1850; <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 519 (2d Cir. 2006), <u>cert. denied</u>, – S. Ct. –, 2007 WL 1406892 (Oct. 1, 2007); <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 63-64; <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d at 95; <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d at 315; <u>DeLuca</u> v. <u>Lord</u>, 77 F.3d 578, 584 (2d Cir.), <u>cert. denied</u>, 519 U.S. 824, 117 S. Ct. 83 (1996).

"[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 694, 104 S. Ct. at 2068; <u>accord</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 534, 123 S. Ct. at 2542.  The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not." <u>Strickler</u> v. <u>Greene</u>, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53 (1999); <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995); <u>Nix</u> v. <u>Whiteside</u>, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under <u>Strickland</u>"); <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 694, 104 S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").  Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." <u>Strickland</u> v. <u>Greene</u>, 527 U.S. at 291, 119 S. Ct. at 1953; <u>cf. id</u>. at 297-301, 119 S. Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

U.S. at 695-96, 104 S. Ct. at 2069); accord, e.g., Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991).

   The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. at 697, 104 S. Ct. at 2069.[16]

   In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland v. Washington, 466 U.S. at 690-91, 104 S. Ct. at 2066.[17]

---

[16] Accord, e.g., Smith v. Robbins, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14 (2000).

[17] See also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); Engle v. Isaac, 456 U.S. 107, 134, 102 S. Ct. 1558, 1575 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing Strickland claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), cert. denied, 513 U.S. 820, 115 S. Ct. 81 (1994).

As the Second Circuit noted:  "The <u>Strickland</u> standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d at 199; <u>accord</u>, <u>e.g.</u>, <u>Bell</u> v. <u>Miller</u>, 2007 WL 2469423 at *4.

A.    **Strickland and the AEDPA Review Standard**

For purposes of this Court's AEDPA analysis, "the <u>Strickland</u> standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)).[18/]  "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'" <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d at 95 n.8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly. . . . Rather, he must show that the [First Department] applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner." <u>Bell</u> v. <u>Cone</u>, 535 U.S. 685, 698-99, 122 S. Ct. 1843, 1852 (2002); <u>see also</u>, <u>e.g.</u>, <u>Yarborough</u> v. <u>Gentry</u>, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003); <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d at 519.

---

[18/]    See also, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 2535 (2003); <u>Bell</u> v. <u>Cone</u>, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852 (2002); <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 518-19 (2d Cir. 2006), <u>cert. denied</u>, – S. Ct. –, 2007 WL 1406892 (Oct. 1, 2007); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 315 (2d Cir. 2001).

## II.   CURRY'S INEFFECTIVE ASSISTANCE CLAIMS SHOULD BE DENIED

### A.   Trial Counsel's Decisions re Investigation and Not Calling Three Witnesses at Trial Were Reasonable Strategic Decisions and Did Not Constitute Deficient Performance

Curry asserts that his trial counsel was ineffective due to his "failure to pursue and call [three] exculpatory eyewitnesses to trial."  (See, e.g., Dkt. No. 3: Curry Br. at 17; see also Dkt. No. 2: Pet. ¶¶ 6(a), 15-16; Dkt. No. 58: Curry 8/23/07 Post-Hearing Br. at 5-8.)

Curry's July 1998 trial counsel Donald Duboulay testified that his decision not to further investigate or call the three eyewitnesses was a strategic decision based primarily on the fact that two of the witnesses had identified Curry in a lineup, and the eyewitness testimony would have corroborated much of Guzman's account of the murder, including  that there were three men in the car, that the shot was fired from inside the car, as well as the make of car from which the shot was fired.  (See pages 8-9 above.)  Knowing that the prosecution was not going to call the three witnesses, Duboulay concluded that any discrepancies in the witnesses' initial descriptions of the perpetrators would not have aided Curry's defense case and "[i]t was [his] belief that their testimony would thus damage Mr. Curry's case far more than it would have advanced it." (See page 8 above.) During the hearing, Duboulay testified that "you don't want to bring up the fact he was picked out of a lineup in front of a jury.  Doesn't help us.  I mean, the people didn't put it in their direct case; I [didn't] see why I should [have] put it in my defense case."  (Dkt. No. 57: Duboulay: H. 20.) Duboulay's "position [was] that introducing independent witnesses who would have corroborated

much of Guzman's and Curry's statements – both of which [he] argued were unreliable – would only have undermined Mr. Curry's case."  (See page 9 above.)

Having seen Curry and Duboulay testify, the Court finds Duboulay's hearing testimony to be credible and indeed corroborated by Curry's own testimony.  It is undisputed that Duboulay reviewed the police reports concerning these three witnesses, and made the strategic decision that based on what they had told the police, their testimony would have been more harmful than helpful to Curry.  The harm was that two of the three witnesses had picked Curry out of a lineup as being one of the three men involved in the shooting, and the witnesses' statements were largely consistent with Guzman's testimony.  Dubuoulay explained this to Curry at the time, as Curry admits.  The Court finds Duboulay to be credible, accepts his testimony, and concludes that his decision not to call the three witnesses to testify at trial (or to make further efforts to investigate them) was an informed strategic choice.[19]

_____

[19]    The Court further notes that Curry's argument would have required Duboulay to have called the three witnesses on the defense case, bring out that two of them identified Curry at lineups, and then to essentially cross-examine them about their arguably different descriptions of Curry (or other perpetrators) given to the police.  It is one thing where a prosecution witness testifies on direct to identifying a defendant at a lineup and then is cross-examined about discrepancies in the description given to the police.  It is quite another – and likely disastrous – to put such a witness on the stand as a defense witness.

Curry's further suggestion that Duboulay should have questioned the witnesses about whether the police "coached or coerced" them to identify Curry (e.g. Dkt. No. 52: Curry 5/28/07 Br. at 10) – with no evidence to support such a claim and certainly no evidence with which to impeach the witnesses if the witnesses denied being coached or coerced – certainly would have been highly risky.  See, e.g., King v. City of New York, Nos. 99 CV 3669 & 05 CV 3247, 2007 WL 959696 at *14 (E.D.N.Y. Mar. 30, 2007) ("An arrest report supplement relating to the . . . robbery . . . states that King was identified 'in line-up.' . . . King is correct
(continued...)

Having concluded that Duboulay's decision was strategic, the Court further examines whether that strategic decision constituted ineffective assistance.

The Supreme Court stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 691, 104 S. Ct. 2052, 2066 (1984); <u>see also</u> page 26 above.  This Court finds that it was a reasonable strategic decision for Duboulay not to further investigate witnesses who were not being called by the prosecution, whose addresses were not provided and not likely to be provided to the defense,[20] and who in counsel's view would have

---

19/    (...continued)
that defendants offer no evidence that [the victim] identified him in a line-up, but he is incorrect that a rational juror could take that omission to indicate that the [police] coerced [the victim] into implicating King, because King's signed, written confession went some considerable way toward identifying him as the perpetrator of the . . . robbery of [the victim].  Because there is no evidence that the two witnesses were coerced, this [§ 1983] claim too is dismissed as a matter of law.").

The Court is in full agreement with Duboulay's rejection of Curry's approach.  Putting it another way, the Court certainly cannot say that Duboulay's strategic decision was not only erroneous but ineffective, nor that the First Department's decision was an unreasonable application of the <u>Strickland</u> standard.

20/    Duboulay further explained that he did not have the witnesses' addresses and based on his experience, he was not likely to obtain their addresses from the prosecution.  (<u>See</u> page 16 above.)  In a perfect world, a counsel with unlimited time and resources might have made a motion to compel the prosecution to provide the addresses, but <u>Strickland</u> does not require counsel to be perfect, only to be reasonable.  (<u>See</u> page 26 above.)  It was reasonable for Duboulay to have decided, based on what he knew about these witnesses, not to make a
(continued...)

undermined his trial strategy and been harmful to the defense case.  See, e.g., Burger v. Kemp, 483 U.S. 776, 794-95, 107 S. Ct. 3114, 3126 (1987); Perkins v. Comm'r of Corr. Servs., 218 Fed. Appx. 24, 26 (2d Cir. 2007) ("Perkins challenges as ineffective assistance of counsel his . . . counsel's alleged failure to explore the testimony of additional potential witnesses.  Trial counsel's affidavit adequately . . . establishes that the other alleged witnesses were not actual witnesses to the crime. Counsel's decisions, seen in the context of his vigorous attack on the reliability of the identification of Perkins by the only eyewitness, fall within 'the wide range of professionally competent assistance.'"); Brown v. Miller, 185 Fed. Appx. 25, 27 (2d Cir. 2006), cert. denied, 127 S. Ct. 938 (2007); Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005) ("But, as a general matter, when there is 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'"  Moreover, as with Curry, petitioner's "'failure-to-investigate' argument is identical to and no greater than his 'failure-to-introduce evidence' argument . . . [i]t is not a complaint about the scope of [counsel's] investigation but, rather, a complaint about trial strategy cast in investigatory terms."), cert. denied,

---

[20]/     (...continued)
        motion to compel production of their addresses.  See, e.g., People v. Collins, 287 A.D.2d 271, 271, 730 N.Y.S.2d 511, 513 (1st Dep't 2001) ("The People did not violate their obligations under People v. Rosario . . . by redacting the telephone numbers and addresses of 911 callers from Rosario material.") (citing cases); People v. Perry, 266 A.D.2d 151, 152-53, 700 N.Y.S.2d 107, 109 (1st Dep't 1999) ("The People disclosed the potential witness's address and telephone number during jury selection, as directed by the court upon defense counsel's claim that the witness's statement contained potentially exculpatory information. Although the witness ultimately could not be located by the prosecution or defense, defendant has not shown that earlier disclosure would have resulted in the witness's availability, or that her testimony would have been exculpatory.") (citing cases), appeal denied, 95 N.Y.2d 856, 714 N.Y.S.2d 7 (2000).

546 U.S. 1184, 126 S. Ct. 1363 (2006); United States v. Hyman, 128 Fed. Appx. 195, 198 (2d Cir.

2005); Robinson v. Senkowski, 100 Fed. Appx. 10, 11 (2d Cir. 2004) (Counsel was not ineffective

for "failing to investigate two potential alibi witnesses" because "[t]he alibi that would have been

offered by the two potential witnesses contradicted the alibi offered at trial. Therefore, it was a

legitimate trial strategy not to investigate or present witnesses who would have provided defendant

with an alternative alibi."); Ryan v. Rivera, 21 Fed. Appx. 33, 35 (2d Cir. 2001) (Counsel was not

ineffective for "not interviewing the proposed witnesses" where defendant "obtain[ed] statements

from the witnesses which, together with what [petitioner] had told [counsel] and the police reports

obtained by discovery, provided counsel with sufficient information to conclude, as he apparently

did, that the alibi witnesses were not credible or that their testimony would harm [petitioner] more

than it would help him."); United States v. Romero, 91 Cr. 586, 1993 WL 485677 at *7-8 (S.D.N.Y.

Nov. 22, 1993) (An attorney is under no obligation to investigate every line of defense a defendant

suggests, and, instead, "an attorney is required only to make a reasonable decision about whether to

investigate a particular line of defense based upon the overall defense strategy." Counsel was not

ineffective for not interviewing two eyewitnesses because their testimony "would not be helpful to

his planned defense" and for not interviewing alibi witnesses since "he believed it would be fruitless

to pursue such testimony, since it could not conclusively establish" the defendant's alibi. As in

Curry's case, counsel "chose to read [certain witnesses'] statements to the jury rather than call them

as witnesses in order to 'achieve the full benefit of their testimony without assuming any risk' of

cross-examination or impeachment."), aff'd, 54 F.3d 56 (2d Cir.1995), cert. denied, 517 U.S. 1149, 116 S. Ct. 1449 (1996).[21]

       This Court also finds that it was a reasonable strategy not to call the three witnesses to testify for the defense, since two had picked Curry out of lineups and attorney Duboulay believed that all of their testimony was consistent with Guzman's testimony that he was trying to impeach. See, e.g., Perkins v. Comm'r of Corr. Servs., 218 Fed. Appx. at 26 (Counsel was not ineffective for decision "not to call as alibi witnesses Perkins's aunt and father" because "trial counsel's affidavit adequately explain[ed] his strategic reasons for not calling the alibi witnesses . . . Counsel's

---

[21]    See also, e.g., Halo v. United States, No. 06 CV 5041, 2007 WL 1299158 at *13 (E.D.N.Y. Apr. 30, 2007) ("[T]he duty to investigate does not . . . compel defense counsel to investigate comprehensively every lead or possible defense . . . or to scour the globe on the off-chance something will turn up.") (quotations omitted); United States v. Morris, No. CRIM. 3:02ER53, 2005 WL 80881 at *5 (D. Conn. Jan. 12, 2005) ("A lawyer has no duty to undertake a wild-goose chase to uncover evidence that might support a palpably incredible defense proposed by her client. It is even conceivable that undertaking such an investigation might harm a client, by wasting time and resources that could better be devoted to the pursuit of more reasonable claims."); Johnson v. United States, 307 F. Supp. 2d 380, 391-92 (D. Conn. 2003) ("Petitioner alleges that his trial counsel was ineffective for failing to use proper investigative procedures to locate two potential witnesses. Johnson now claims these witnesses could have testified against the government's contention that Johnson had employed them to drive Rivera to deliver heroin. Petitioner acknowledges that his trial counsel attempted to subpoena these two individuals, but was unsuccessful as they had moved out of town. He now alleges his counsel should have made a more diligent effort to find these witnesses. . . . [T]his court finds that it was reasonable for Johnson's trial counsel to decide not to pursue these witnesses further. Johnson provides no reason for the court to believe these witnesses would have exonerated him. In contrast, there is a distinct possibility that the witnesses may have further inculpated the petitioner. "); Chacko v. United States, 96 Cr. 519 & 00 Civ. 405, 2000 WL 1808662 at *7 (S.D.N.Y. Dec. 11, 2000) ("The petitioner alleges that his trial counsel was inadequately prepared and failed to investigate his claim. . . . [E]ach of these witnesses could have given testimony that was harmful to the defendant. The decision to put on witnesses is a strategic decision within the discretion of trial counsel.").

decisions, seen in the context of his vigorous attack on the reliability of the identification of [petitioner] by the only eyewitness, fall within 'the wide range of professionally competent assistance.'"); Greiner v. Wells, 417 F.3d at 319, 323 ("We will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside.'"  Noting Strickland's deference to counsel's strategic decisions, the Court held that "[o]ur deference is particularly apt where, as here, an attorney decides not to call an unfriendly witness to the stand and has precious little means of determining how the witness might testify."); United States v. Krangle, 142 Fed. Appx. 504, 506 (2d Cir.) (Counsel was not ineffective for his "decisions as to whether to call various witnesses in support of a pre-trial motion; these decisions were reasonable and fell 'squarely within the ambit of trial strategy.'"), cert. denied, 546 U.S. 1079, 126 S. Ct. 837 (2005); Pena-Martinez v. Duncan, 112 Fed. Appx. 113, 115 (2d Cir. 2004) (Trial counsel's "decision not to call Laracuente as a witness was based on an interview he had with her in which he learned that . . . she would not provide testimony that would be helpful to him. . . . Based on the information contained in the [trial counsel's] affidavit, we conclude that trial counsel's decision not to call Laracuente was strategic" and hence not ineffective.); United States v. Montilla, 85 Fed. Appx. 227, 231 (2d Cir. 2003) (Counsel was not ineffective for "failing to call defendant's brother" because of "defense counsel's strategy of arguing that [the brother], rather than the defendant, was the person to whom [the co-defendant] brought the drugs."  "It is well settled that '[t]he decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess.'"); Stallings v. Woods, No. 04 CV 4714, 2006 WL 842380 at *21 (E.D.N.Y. Mar. 27,

2006) ("Defense counsel's decision not to pursue Garcia as a witness was plainly reasonable in the face of clear evidence that his testimony would have been highly incriminating.  As petitioner notes in his own appellate brief, the prosecution served the defense with disclosure that on October 19, 1999, Garcia viewed a photograph and identified petitioner as one of the robbers. . . . It is difficult to fathom how petitioner faults his attorney for failing to seek as a 'defense witness' someone who might well have identified him in court as one of the robbers.").[22/]

---

[22/]    See also, e.g., Powell v. Lehman, No. 05-35532,  2006 WL 1069560 at *2 (9th Cir. Apr. 24, 2006) (counsel was not ineffective for failing to call witness where proposed testimony was highly inconsistent), cert. denied, 127 S. Ct. 561 (2006); Llanos v. Goord, 06 Civ. 0261, 2006 WL 1981749 at *19 (S.D.N.Y. July 14, 2006) (Peck, M.J.) (counsel was not ineffective for failing to call witness whose testimony he felt would be harmful); Reed v. Smith, No. 05-CV-3969, 2006 WL 929376 at *7-8 (E.D.N.Y. Apr. 11, 2006) (trial counsel was not ineffective where witnesses' "reliability . . . was certainly questionable enough to ratify his strategy of refraining from calling them."); Bonilla v. Portuondo, 00 Civ. 2369, 2004 WL 350694 at *11 (S.D.N.Y. Feb. 26, 2004) ("The petitioner asserts that his attorney's failure to call Ms. Ramos and Ms. McGannon prejudiced his defense. . . . He asserts that these witnesses would have cast doubt on the credibility of Mr. Delgado because . . . in his lineup identification of the petitioner, Mr. Delgado may have simply mistaken a person he saw at the crime scene (i.e., the petitioner) for the shooter. . . . Finally, the petitioner argues that these witnesses would have testified to seeing the petitioner approach the park from the opposite direction from where the shooter fled, 'making it impossible for Mr. Bonilla to have been the perpetrator.' . . . During an evidentiary hearing before this Court, the petitioner's trial attorney, Mr. Torres, described his reasons for deciding not to call Ms. Ramos and Ms. McGannon as witnesses. . . . Mr. Torres stated that while he found Ms. Ramos and Ms. McGannon to be 'bright and articulate, . . . their testimony . . . wasn't too helpful, and in some cases a bit damaging.' . . . According to Mr. Torres, . . . Ms. Ramos' and Ms. McGannon's testimony [was not helpful] because these witnesses had not observed the shooting itself and instead implicated the petitioner by placing him at the scene of the crime. . . . Mr. Torres' testimony establishes that his decision not to call these witnesses was a reasonable one based on legitimate, tactical considerations.  As Ms. Ramos and Ms. McGannon were not eyewitnesses to the shooting, Mr. Torres had to balance the helpfulness of their testimony against the potential that it would reveal other damaging facts, such as the reasons for the police investigation of the petitioner."), report & rec. adopted, 2004 WL 1782174 (S.D.N.Y.

(continued...)

The Second Circuit has held that "counsel's decision as to 'whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation.'"  United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (quoting United States v. Schmidt, 105 F.3d 82, 90 (2d Cir.), cert. denied, 522 U.S. 846, 118 S. Ct. 130 (1997)), cert. denied, 532 U.S. 1007, 121 S. Ct. 1733 (2001).  Courts in this Circuit have made clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.), cert. denied, 484 U.S. 958, 108 S. Ct. 357 (1987);[22] see, e.g., United States v. DeJesus, 57 Fed. Appx. 474, 478 (2d Cir.) ("A trial

---

[22]   (...continued)
Aug. 9, 2004); Farinaro v. Kirk, 675 F. Supp. 75, 82 (E.D.N.Y. 1987) ("Petitioner asserts that counsel's failure to call certain witnesses – Mrs. Gould's husband, who was unable to identify petitioner at a police lineup, and members of the Fenslaw household, who allegedly could provide alibis for petitioner – constituted ineffective assistance. . . . Counsel and the State stipulated to Mr. Gould's failure to identify petitioner.  Petitioner thus received the benefit of Mr. Gould's testimony without having its effect possibly diluted by, say, Mr. Gould's subsequent belief that petitioner was his assailant.  Similarly, there is no indication that members of the Fenslaw household would have provided testimony that, on balance, was favorable to petitioner.  Counsel's decision not to call either Mr. Gould or the Fenslaws epitomizes the type of tactical decision to which Strickland commands deference."), aff'd, 872 F.2d 1021 (2d Cir. 1989); People v. Marrero, 156 A.D.2d 141, 142, 548 N.Y.S.2d 188, 189 (1st Dep't 1989) ("[T]he court below properly permitted the introduction of evidence and testimony concerning a prior negative lineup, where defense counsel had 'opened the door' to admission of that evidence by, on cross-examination, repeatedly challenging [a witness's] ability to accurately identify the defendant as the assailant."), appeal denied, 75 N.Y.2d 921, 555 N.Y.S.2d 40 (1990).

[23]   Accord, e.g., Brown v. Brown, 05 Civ. 10434, 2006 WL 3405480 at *18 (S.D.N.Y. Nov. 27, 2006) (Peck, M.J.); Llanos v. Goord, 2006 WL 1981749 at *19; Kanani v. Phillips, 03 Civ. 2534, 2004 WL 2296128 at *27 (S.D.N.Y. Oct. 13,  2004) (Peck, M.J.), report & rec.
(continued...)

counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.' Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed." Counsel's decision not to call a particular witness was grounded in strategy and not deficient, "even though [defendant] requested that she do so and provided her with contact information for potential witnesses.") (citation omitted), cert. denied, 538 U.S. 1047, 123 S. Ct. 2110 (2003).[24]

---

[23] (...continued)
adopted, 2005 WL 2431416 (S.D.N.Y. Oct. 3, 2005); Smalls v. McGinnis, 04 Civ. 0301, 2004 WL 1774578 at *19 (S.D.N.Y. Aug. 10, 2004) (Peck, M.J.); Rodriguez v. Senkowski, 03 Civ. 3314, 2004 WL 503451 at *41 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); Gomez v. Duncan, 02 Civ. 0846, 2004 WL 119360 at *31 (S.D.N.Y. Jan. 27, 2004) (Peck, M.J.); Montalvo v. Annetts, 02 Civ. 1056, 2003 WL 22962504 at *25 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); Skinner v. Duncan, 01 Civ. 6656, 2003 WL 21386032 at *37 (S.D.N.Y. June 17, 2003) (Peck, M.J.).

[24] See also, e.g., United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), cert. denied, 538 U.S. 1021, 123 S. Ct. 1949 (2003); United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998), cert. denied, 526 U.S. 1164, 119 S. Ct. 2059 (1999); United States v. Schmidt, 105 F.3d 82, 90 (2d Cir.), cert. denied, 522 U.S. 846, 118 S. Ct. 130 (1997); Lou v. Mantello, No. 98-CV-5542, 2001 WL 1152817 at *10 (E.D.N.Y. Sept. 25, 2001) ("Habeas claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative.'") (quoting Ruzas v. Sullivan, 85 Civ. 4801, 1988 WL 83377 at *14 (S.D.N.Y. Aug. 2, 1988)); Nieves v. Kelly, 990 F. Supp. 255, 263-64 (S.D.N.Y. 1997) (Cote, D.J. & Peck, M.J.); Rodriguez v. Mitchell, 92 Civ. 2083, 1993 WL 229013 at *3, 5 (S.D.N.Y. June 24, 1993) ("Counsel's decision not to call a witness, if supported by valid tactical considerations, does not constitute ineffective assistance of counsel.").

Moreover, "[g]enerally, the decision whether to pursue a particular defense is a tactical choice which does not rise to [the] level of a constitutional violation. . . . [T]he habeas court 'will not second-guess trial strategy simply because the chosen strategy has failed . . . ,' especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial." Jones v. Hollins, 884 F. Supp. 758, 765-66 (W.D.N.Y. 1995) (citations omitted), aff'd, No. 95-2279, 89 F.3d 826 (table), 1995 WL 722215 (2d Cir. Nov. 30, 1995); accord, e.g., United States v. DeJesus, 57 Fed. Appx. at 478 ("A trial counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.'"); United States v. Schmidt, 105 F.3d at 90 ("[T]he tactical decision of whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation."); Lawson v. Caspari, 963 F.2d 1094, 1096 (8th Cir. 1992) (Counsel was not ineffective for failing to call alibi witnesses he did not believe were credible, especially where counsel "presented a theory of the case by pointing out the 'weaknesses in the state's case and rais[ing] serious questions about the credibility of the state's sole eyewitness.'"); Harris v. Hollins, 95 Civ. 4376, 1997 WL 633440 at *6 (S.D.N.Y. Oct. 14, 1997) (counsel not ineffective for not securing alibi witnesses where counsel presented a vigorous defense).

Curry testified that he instructed attorney Duboulay to call the three witnesses to testify at his trial.  (See pages 11-12, 13 n.6 above.)  Duboulay denied that Curry so instructed him. (See page 19 above.)  The Court credits Duboulay's testimony and not Curry's on this point (the only

point on which their testimony was inconsistent).  As the prosecution pointed out in cross-examining Curry, prior to this Court's hearing, Curry never claimed that he had instructed counsel to call the witnesses.  (See pages 13-14 n.6 above.)  Considering the length and amount of detail in Curry's pro se brief to the First Department, his pro se federal habeas corpus petition and his other submissions to this Court, none of which made this factual assertion, the Court finds Curry's claim at the hearing to be an invention.  But even if it were true that Curry instructed Duboulay to call the witnesses at trial, it would not change the result.  Certain decisions, such as whether the defendant will testify at trial, are personal to the defendant and the defendant's decision controls.  E.g., Brown v. Artuz, 124 F.3d 73, 79 (2d Cir.1997) ("[T]he ultimate decision whether to take the stand belongs to the defendant."), cert. denied, 522 U.S. 1128, 118 S. Ct. 1077 (1998).  But decisions as to trial strategy, including what witnesses to call, are to be made by counsel, not the defendant.

Under Strickland's first prong, the petitioner has the burden to show that counsel's performance was deficient.  (See page 23 above.)  Curry has not met that burden.  Rather, Duboulay's affidavit and his testimony at this Court's hearing (corroborated by Curry's own testimony) made clear that counsel made a considered, strategic decision that the downside to the witnesses' testimony substantially outweighed any benefits.  Counsel discussed his strategy with Curry.  The Court agrees with Duboulay that the witnesses' identification of Curry as involved in the murder and their corroboration of Guzman's testimony would have been far more damaging than the discrepancies in their descriptions of those involved in the shooting.  Counsel was not ineffective for making the

strategic decision not to further investigate or to present witnesses who could have damaged his trial strategy.

Moreover, this case is governed by the AEDPA.  Thus, "[f]or [petitioner] to succeed . . . he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance. . . . Rather, he must show that the [First Department] applied <u>Strickland</u> to the facts in an objectively unreasonable manner." <u>Bell</u> v. <u>Cone</u>, 535 U.S. 685, 698-99, 122 S. Ct. 1843, 1852 (2002).  Curry has not shown that the First Department applied <u>Strickland</u> in an objectively unreasonable manner.  Indeed, this Court fully agrees with the First Department that attorney Duboulay's decision to not call the three witnesses was a reasonable strategic decision and not ineffective assistance of counsel.

**B.    Curry Explicitly Withdrew His Original Ineffective Assistance Claims Regarding The Summation**

In his original petition (and the subject of the Second Circuit's remand), Curry claimed that counsel's summation was defective because he "went on to tell the jury during the homicide trial that in fact Curry had shot the deceased with a second gun, and the only reason Curry was not caught with this second gun is because Curry got rid of it by throwing it away" and because he "insinuated to the jury that Curry confessed truthfully after being caught off balance with bold face tricks."  (Dkt. No. 2: Pet. ¶¶ 36-39.)  After prompting by this Court, after the hearing Curry agreed to "withdraw those claims that were unsupported by the record," including, <u>inter alia</u>, claims 36-39, constituting all all of his original defective summation claims.  (Dkt. No. 58: 8/23/07 Curry Post Hearing Br. at 9-10.)  Accordingly, the Second Circuit's third question on remand is moot

because Curry, with advice of counsel, withdrew his original summation ineffective assistance claims.

### C.      Curry's New Assertion Regarding False Confession Expert Testimony Is Unexhausted, and Procedurally Barred, and Meritless

During the hearing and in his post-hearing brief, Curry's appointed counsel Wilford raised the topic of a "false confession" expert.  (See pages 20-22 above; Dkt. No. 58: 8/23/07 Wilford Br. at 8-9.)  Att. Wilford "asserts that this line of questioning was appropriate to establish the deficiency of trial counsel's performance in his summation, one of the three grounds the Second [C]ircuit directed to be addressed at the hearing on remand."  (8/23/07 Curry Post-Hearing Br. at 9.) Wilford contends that the argument is relevant to summation defects because "[t]rial counsel . . . did not attempt to retain a 'false confession' expert, yet nonetheless attempted to interpose the defense of 'false confession' in his summation based on a perfunctory cross examination of the lead Detective in the case on this issue."  (Id.)  Wilford argues that "the facts and circumstances of this case, particularly in view of the lack of investigation of the witnesses which would have provided an additional basis to buttress the claim of 'false confession', necessarily lent themselves to the utilization of an expert."  (Id.)

Wilford's argument, although creative, is a bootstrapping attempt to raise a totally new claim that was not raised at any level prior to the hearing on remand.  The claim has nothing to do with summation – obviously, since counsel did not call a false confession expert to testify, he could not refer to such an expert on summation.  But even as a summation claim, it is barred.  Curry never mentioned lack of a false confession expert as a claimed defect in any form in his state appeals (or

state collateral proceedings), nor did Curry raise this claim in his habeas petition.  (<u>See</u> pages 5-8

above.)  Curry's habeas counsel conceded that Curry never raised the false confession expert claim

in state court or his habeas petition.  (<u>See</u> page 22 & n.9 above.)  The claim therefore is not properly

before this Court.  It is not subsumed within Curry's totally different summation claims that he has

now withdrawn.  (<u>See</u> Point II. B. above.)  Arguing that a summation is defective for one reason does

not preserve the argument that the same summation is defective for a different reason.  <u>See</u>, <u>e.g.</u>,

<u>Jones</u> v. <u>Keane</u>, 329 F.3d 290, 294-95 (2d Cir.) ("Exhaustion requires a petitioner fairly to present

the federal claim in state court.  A petitioner has fairly presented his claim only if he has informed

the state court of both the factual and the legal premises of the claim he asserts in federal court.  The

claim presented to the state court, in other words, must be the substantial equivalent of the claim

raised in the federal habeas petition.") (quotations and citations omitted), <u>cert. denied</u>, 540 U.S.

1046, 124 S. Ct. 804 (2003); <u>Twitty</u> v. <u>Smith</u>, 614 F.2d 325, 332 (2d Cir. 1979) ("The fact that

effective assistance of counsel was mentioned in the contexts of a Wade hearing and the mistrial

motion did not suffice to alert the state court to all of the [effective assistance] claims Twitty raises

here, and we find that these other claims were not fairly presented to the state court on the basis of

denial of assistance of counsel."); <u>Lebron</u> v. <u>Girdich</u>, 03 Civ. 2765, 2003 WL 22888809 at *4 & n.8

(S.D.N.Y. Dec. 5, 2003) ("Th[e] claim [of ineffective assistance of counsel with respect to the

prosecution's summation] is unexhausted because petitioner failed to raise it on appeal. . . . That

petitioner raised another ineffective assistance claim on direct appeal is irrelevant.  For a claim of

ineffective assistance to be deemed exhausted, a petitioner must have presented to the state court <u>all</u>

factual allegations on which that claim is based.  Petitioner's previous ineffective assistance claim was based on other alleged errors, and included no mention of his counsel's failure to object to the prosecutor's summation.") (citation omitted).

In short, Curry's false confession expert claim should be denied because, as Curry's habeas counsel conceded, it was not raised in Curry's habeas petition.  (See page 22 & n.9 above.) Even if the Court were to treat Curry's new argument as a request to amend his habeas petition at this late date to assert such a claim, the claim would have to be denied.  Any current ineffective assistance  claim by Curry based on a failure to retain a false confession expert, within a defective summation ineffective assistance claim or as a stand-alone ineffective assistance claim, would be unexhausted but deemed exhausted and procedurally barred, because it concededly was never raised in state court.  See, e.g., Harrison v. Walsh, 06 Civ. 13328, 2007 WL 1576265 at *21-22 (S.D.N.Y. June 1, 2007) (Peck, M.J.) (& cases cited therein) (discussing the exhaustion doctrine), report & rec. adopted, 2007 WL 2844867 (S.D.N.Y. Sept. 27, 2007).[25/]

---

[25/]    Moreover, Curry's habeas counsel did not cite a single case in his post-hearing brief to demonstrate that New York courts would have allowed false confession expert testimony at the time of Curry's trial in 1998, nor that such testimony would be allowed – much less required for counsel to be effective – since. (See 8/23/07 Curry Post Hearing Br. at 8-9.)  To the contrary, this Court's research reveals that New York State cases at the time of Curry's trial (and since) have not allowed false confession expert testimony.  See, e.g., People v. Days, 31 A.D.3d 574, 575, 817 N.Y.S.2d 535, 535 (2d Dep't) ("The trial court providently exercised its discretion in precluding expert testimony as to the defendant's susceptibility to police interrogation techniques."), appeal denied, 7 N.Y.3d 811, 822 N.Y.S.2d 486 (2006); People v. Shepard, 259 A.D.2d 775, 777, 687 N.Y.S.2d 196, 198 (3d Dep't) ("County Court did not abuse its discretion in denying defendant's request to introduce expert testimony regarding the validity of defendant's confession. Where the evidence sought to be introduced does not depend upon professional or scientific knowledge or skill not within the range of
(continued...)

## CONCLUSION

For the reasons discussed above, Curry's remanded habeas claims that trial counsel was ineffective for not calling certain witnesses and for giving a defective summation should be DENIED, as should Curry's new false confession expert claim.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections.

---

25/   (...continued)
ordinary training or intelligence, there is no occasion to resort to expert testimony.") (quotations omitted), appeal denied, 93 N.Y.2d 979, 695 N.Y.S.2d 65 (1999); People v. Green, 250 A.D.2d 143, 146-47, 683 N.Y.S.2d 597, 599-600 (3d Dep't 1998) ("County Court did not abuse its discretion in rejecting defendant's proffered expert" "who was prepared to offer testimony concerning defendant's interrogative suggestibility that purportedly made him susceptible to providing a false confession.  When we previously considered the issue of the admissability of expert testimony on the interrelationship between a defendant's psychological profile and the reliability of a confession, we found that such testimony was properly excluded.  We reasoned that it was not sufficiently relevant to outweigh the confusion it would inject into the trial and, moreover, was lacking in the degree of certainty that would give it probative force.") (citing People v. Lea, 144 A.D.2d 863, 864, 534 N.Y.S.2d 588, 590 (3d Dep't), appeal denied, 73 N.Y.2d 857, 537 N.Y.S.2d 503 (1988)), appeal denied, 93 N.Y.2d 873, 689 N.Y.S.2d 435 (1999); People v. Wiggins, 16 Misc. 3d 1136(A), 2007 WL 2598351 at *5-7 (Sup. Ct. Bronx Co. Aug. 24, 2007) (Trial counsel was not ineffective for failing to call a false confession expert at trial because "it is fairly clear that expert testimony about false confessions would not have been permitted under New York State law at the time of defendant's trial" in 1998.  "Moreover, it appears that such testimony would not be permitted under New York State law today either.  It therefore makes little sense to fault trial counsel for failing to offer expert testimony covering false confessions.  In all likelihood, the trial court would have barred such testimony, and properly so.") (citations omitted) ; People v. Philips, 180 Misc. 2d 934, 940, 692 N.Y.S.2d 915, 919 (Sup. Ct. Queens Co. 1999) (Trial court denied application to appoint a "voluntariness" expert because "[l]acking . . . general scientific acceptance, this court finds that the submitted documentation is insufficient to constitute a recognized and accepted scientific basis.").

See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 1310, and to my chambers, 500 Pearl Street, Room 1370.  Any requests for an extension of time for filing objections must be directed to Judge Kaplan (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATED:      New York, New York
            October 23, 2007

                                    Respectfully submitted,

                                    Andrew J. Peck
                                    United States Chief Magistrate Judge

Copies to:   Jerome Curry
             Edward D. Wilford, Esq.
             Nicole Beder, Esq.
             Judge Lewis A. Kaplan

H:\OPIN\CURRY2